**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

TROY KNIGHT, #202280,          *
                               *
    Plaintiff,             *
                               *
vs.                            *   CIVIL ACTION NO. 18-00036-JB-B
                               *
K. LANG, *et al.*,             *
                               *
    Defendants.            *

## REPORT AND RECOMMENDATION

Plaintiff Troy Knight, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed the instant action under 42 U.S.C. § 1983.  This action has been referred to the undersigned Magistrate Judge for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R) and is now before the Court on Defendants Kelvin Lang and Michael Mitchell's motion for summary judgment.[1]  (Docs. 13, 14, 21).  After careful review, the undersigned recommends that Defendants' motion for summary judgment be **GRANTED**, and that this action be **DISMISSED with prejudice.**

---

[1] On August 5, 2019, the undersigned converted Defendants' answer and special report (Docs. 13, 14) to a motion for summary judgment.

## I.  PROCEDURAL AND FACTUAL BACKGROUND[2]

Plaintiff Troy Knight brings this suit against Sergeant Kelvin L. Lang and Officer Michael A. Mitchell for failing to protect him from an inmate attack during his incarceration at Holman Correctional Facility ("Holman").

On October 25, 2017, Knight was stabbed by another inmate in the abdomen and face in B-Dorm of Holman.  Knight alleges that Defendants Lang and Mitchell "stayed outside the cellblock and watched [him] get stabbed."[3]  (Doc. 1 at 8).  According to Knight, Defendants are responsible for the attack because they allowed his assailant "to leave the dormitory and go get a knife" prior to the

---

[2] The factual allegations are taken from Knight's § 1983 form complaint, which was signed under penalty of perjury.  (See Doc. 1 at 7).  Being in this form, the complaint will be considered by the Court in ruling on the motion for summary judgment.  See Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986) (per curiam). However, "the 'facts', as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925 n.3 (11th Cir. 2000).

[3] In support of his claim that Defendants witnessed the attack, Knight states:

> I feinted [sic] from the incident.  Passed out.  I did not tell them who stabbed me.  They went and picked up the exact inmate who stabbed me without me telling them who it was.  For I was unconscious.  No one else told them.  They already knew who it was because they let him out the cellblock to go get the knife.  And then they watched him stab me.

(Doc. 1 at 8).

2

attack.   (Id. at 4).   Specifically, Knight claims that Sgt. Lang "notice[d] the inmate when he came out for pill call with no state shirt on and he made him get a state shirt on.  Then Sgt. Lang and Officer Mitchell allowed [the inmate] to go to another cell and pick up a knife, and then let him back in B dormitory where he stabbed me."  (Id. at 8).  Also in support of his assertion that Defendants allowed his assailant to leave to dormitory to obtain a knife, Knight alleges that Officer Mitchell witnessed Knight's assailant involved in a fist fight with another prisoner "minutes before" the stabbing of Knight and, therefore, "Officer Mitchell knew there was a raucus [sic] brewing."  (Id. at 4).

Knight further claims that Defendants failed to protect him by providing a general lack of security in the prison.   He specifically alleges:

> [T]hey also provided a lack of security.  Because B dormitory at Holman prison is a 114 man maximum security inmates per dormitory per each dorm.  With no guard posted in the cellblock neither day or night.  And by it being an open-bay cellblock composed of some of the most dangerous prisoners in the United States day and night security was a necessity.  But Sgt. K. Lang and Officer M. Mitchell stayed outside the cellblock and watched me get stabbed.

(Id. at 8).

Knight is suing Defendants Lang and Mitchell in their individual and official capacities for "cruel and unusual punishment and failure to protect [Knight] from harm and danger[,]" in violation of the Eighth Amendment.  (Id. at 5).  Knight seeks

compensatory damages in the amount of $5,000.00 and punitive damages in the amount of $500,000.00 from each Defendant. (Id. at 7).

Defendants have answered the suit and deny the allegations against them and assert all available immunity defenses. (Doc. 13). Defendants have also filed a special report in support of their position. (Doc. 14). In the special report, Defendants contend that Knight's complaint does not state a claim for failure to protect or for a violation of his constitutional rights based on general prison conditions, and that they are immune from liability. (Id. at 6-14).

In an affidavit attached to the special report, Sgt. Lang avers that on the day in question, he was assigned to segregation when he heard a code called in B-Dorm.[4] (Doc. 14-1 at 1). Sgt. Lang states that he responded to the radio call, but by the time he arrived at B-Dorm, the altercation was over, and Knight was walking up the hall. (Id.). Sgt. Lang declares that he did not allow any inmate out of a dorm to get a knife or any weapon, and that he did not witness any altercation between Knight and any other inmate. (Id.).

---

[4] The Holman Shift Log reflects that Sgt. Lang was assigned as the Assistant Shift Commander for population on the night in question. (See Doc. 14-3 at 2).

In his affidavit, Officer Mitchell affirms that he was assigned to B-Dorm as a rover on the evening in question. (Doc. 14-2 at 1).  However, he avers that at the time the incident occurred, he was assisting with population pill call on the main hall of the prison.  (Id.).  Officer Mitchell declares that he did not witness any inmates fight or allow an inmate out of a dorm to retrieve a knife or any weapon.  (Id.).  The Shift Log reflects that Officer Mitchell was assigned to Housing Unit B on the evening of the incident, and that from 8:42 p.m. to 9:05 p.m., Officer Mitchell assisted with pill call. (Doc. 14-3 at 3-4).  The prison reports also reflect that Officer Mitchell was not one of the responding officers to B-Dorm after the incident.  (See id. at 13-14).

The Shift Log further evidences that at 8:59 p.m., Officer Curtis Thompkins, from Cubicle 1, radioed that "something [was] going on in the back of Bravo Dorm." (Id. at 4).  The log reflects that at 9:10 p.m., an inmate was stabbed in Bravo Dorm.  (Id.). At 9:15 p.m., the stabbed inmate was taken to the health care unit, and Sgt. Lang reported the incident to Warden Peters, the on-call duty officer, at 9:22 p.m.  (Id.).  Thereafter, Sgt. Lang contacted Warden Mitchell and I & I Investigator Terry Loggins regarding the stabbing incident in Bravo Dorm.  (Id.).

The Duty Officer Report indicates that at 9:05 p.m., Cubicle 1 Officer Curtis Thompkins observed Knight and inmate David Lucas

in a verbal altercation. (Id. at 9). Officer Thompkins turned on the lights in the dorm. (Id.). At approximately 9:10 p.m., Officer Thompkins radioed for assistance. (Id.). Assisting officers arrived to see Knight standing at the grill gate bleeding from the stomach. (Id.). Both inmates Knight and Lucas denied knowing who stabbed Knight or why. (Id.).

An unsworn and undated statement from Officer Thompkins (attached to the Duty Officer Report) reflects that at approximately 9:05 p.m., Thompkins observed Knight and Lucas in a verbal altercation and turned on the lights in Housing Unit B. (Id. at 12). Then, he saw Knight walk to his bed, where inmate Keundre Johnson was standing. (Id.). Inmate Johnson slapped Knight several times. (Id.). Knight went back toward Lucas, and Lucas walked away. (Id.). Shortly thereafter, Officer Thompkins observed Knight standing at the grill gate of B-Dorm bleeding from his chest and face area. (Id.).

The Incident Report reflects the same incident facts as the Duty Officer Report and expounds on the events following the incident. Namely, the Incident Report adds the following details: that Knight collapsed at the grill gate as it was opened; that Knight was carried to the health care unit for medical assessment and treatment; that officers secured inmate Lucas in the back hall area; that Knight was transported to Atmore Community Hospital at approximately 10:10 p.m.; that Sgt. Lang and Officer Craft escorted

6

Lucas to the health care unit for a medical assessment at approximately 10:50 p.m.; that Lucas had no injuries and denied stabbing Knight; that Lucas was placed in segregation holding pending investigation; and that Knight was airlifted to USA Medical Center from Atmore Community Hospital at approximately 1:00 a.m. on October 26, 2017. (Id. at 13-14).

The medical records evidence that Knight received medical treatment at approximately 9:15 p.m. for a two-centimeter long, two-centimeter deep laceration to his stomach and a one-centimeter long laceration over his right eye. (Id. at 11). Inmate Lucas received a body chart at approximately 10:48 p.m., with no injuries reported or observed.[5] (Id. at 10).

In an order dated August 5, 2019, the Court converted Defendants' answer and special report (Docs. 13, 14) into a motion for summary judgment, explained to the parties the procedure for such motions under Federal Rule of Civil Procedure 56, and afforded the parties an opportunity to submit additional information or

---

[5] The record also contains a letter from inmate Lucas, who asserts that he was placed in segregation after the incident, without a write up or charge. (Doc. 14-3 at 15). He states that "[t]he police that we[re] working know exactly what happened but are on my side." (Id.). He claims the officers wrote up the assault to reflect that Lucas was assaulted from the back and beat the inmate up, not as a stabbing. (Id.). He further claims that he is still in segregation because Warden Terry Raybon created a story about a contract being placed on him in order to keep him in segregation, and that he wants to kill Warden Raybon. (Id.).

evidence in support of or in opposition to the motion September 5, 2019. (Doc. 21). Knight was also directed to inform the Court in writing by said deadline whether he desired to continue with this litigation. (Id. at 4).

Knight filed nothing within the prescribed time period. However, on September 17, 2019,[6] Knight filed a notice of change of address and request for appointment of counsel. (Doc. 22). Knight also requested that all documents from August 5, 2019 to September 1, 2019 be re-sent to him. (Id. at 1). Upon consideration, the undersigned denied Knight's request for appointment of counsel. (Doc. 23). However, in view of Knight's change of address and request for the re-mailing of documents, the undersigned extended the deadline for Knight to inform the Court whether he desired to continue this litigation and to file information or evidence in opposition to the converted motion for summary judgment until November 4, 2019. (Doc. 24).

To date, Knight has failed to file any response, documents, or other evidence or information in opposition to the converted motion for summary judgment. He did, however, in December 2019, file another change of address with the Court (Doc. 25), listing

---

[6] Under the mailbox rule, absent contrary evidence, a prisoner's motion is deemed filed on the date it is delivered to prison officials for mailing. Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001). (See Doc. 22 at 1).

a free-world address in Wedowee, Alabama,[7] which the undersigned construes to indicate Knight's desire to continue with this litigation.  Following a careful review of the parties' pleadings and Defendants' motion for summary judgment and supporting materials, the Court determines that the motion is ripe for consideration.

## II. __SUMMARY JUDGMENT STANDARD__

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (2009) (per curiam) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis in original) (citation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

---

[7] The notices of change of address filed by Knight reflect that he was released from prison in or before May 2019 and, upon release, resided at a free-world address in Wedowee, Alabama.  He was subsequently incarcerated at Tallapoosa County Jail in or around September 2019, but his December 2019 notice reflects that he was released from custody and is again residing in Wedowee, Alabama. (See Docs. 17, 22, 25).

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323; see also Allen v. Bd. of Pub. Educ. for Bibb Cnty., 495 F.3d 1306, 1313 (11th Cir. 2007) ("The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."). Once this initial demonstration is made, the "responsibility then devolves upon the non-movant to show the existence of a genuine issue [of] material fact." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993); see also Allen, 495 F.3d at 1314 ("'When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial.'") (citation omitted); Comer v. City of Palm Bay, Fla., 265 F.3d 1186, 1192 (11th Cir. 2001) (per curiam) ("Once the moving party discharges its initial burden of showing that there is an absence of evidence to support the non-moving party's case, the non-moving party must specify facts proving the existence of a genuine issue of material fact for trial confirmed by affidavits, '"depositions, answers to interrogatories, and admissions on file."'") (citation omitted).

> Forbidding reliance upon pleadings precludes a party
> from "choos[ing] to wait until trial to develop claims
> or defenses relevant to the summary judgment
> motion." . . . This effectuates the purpose of summary
> judgment which "'is to pierce the pleadings and to assess
> the proof in order to see whether there is a genuine
> need for trial.'" . . . Thus, "mere general allegations
> which do not reveal detailed and precise facts" will not
> prevent the award of summary judgment upon a court's
> determination that no genuine issue for trial exists.

Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995) (citations omitted); see also LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998) ("[The nonmoving party] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party."). In other words, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see Comer, 265 F.3d at 1192 ("Summary judgment is required where the non-moving party's response to a motion is merely 'a repetition of his conclusional allegations' and is unsupported by evidence showing an issue for trial.") (citation omitted).

In considering whether the Defendants are entitled to summary judgment in this case, the Court views the facts in the light most favorable to Plaintiff Knight. See id. at 1192 ("We view the evidence and all factual inferences raised by it in the light most

favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to the material facts." A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

Garczynski, 573 F.3d at 1165 (citations omitted). In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp., 43 F.3d at 599.

### III. DISCUSSION

As noted above, Knight seeks redress pursuant to 42 U.S.C. § 1983 for Eighth Amendment violations based on an attack by a fellow inmate. (See Doc. 1). The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment's proscription against cruel and unusual punishment "'imposes a duty on prison officials' to 'take reasonable measures to guarantee the safety of the inmates.'" Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)) (alterations omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into

constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. The Eleventh Circuit has stressed that "a 'prison custodian is not the guarantor of a prisoner's safety.'" Purcell v. Toombs Cnty., Ga., 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted).

### A. Official Capacity Claims.

Both Defendants named in this action are correctional officers employed by the Alabama Department of Corrections. Construing his claims liberally, Knight has sued each Defendant in his official and individual capacity. "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citation omitted); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir. 2009) ("A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual."); Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999) (per curiam) ("We start with the proposition that a suit against a governmental official in his official capacity is deemed a suit against the entity that he represents."). As a practical matter, then, Knight's § 1983 claims against Defendants in their official capacities functionally reduce to § 1983 claims against the State of Alabama itself.

The Eleventh Amendment protects Defendants in their official

13

capacities from Knight's claims.  See, e.g., Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) (stating that with some exceptions, "a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.  This jurisdictional bar applies regardless of the nature of the relief sought.") (citations omitted); Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998) ("[S]tate officials sued in their official capacity are . . . protected by the [Eleventh A]mendment.").  In addition, "a state agency, and a state official sued in his official capacity are not 'persons' within the meaning of § 1983, thus damages are unavailable . . . ."  Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1524 (11th Cir. 1995).  Thus, Knight may not sue Defendants in their official capacities.

**B. Individual Capacity Claims.**

Defendants, however, are not absolutely immune from suit in their individual capacities.

> Qualified immunity protects government officials from liability for civil damages unless they violate a statutory or constitutional right that was clearly established at the time the alleged violation took place.  See Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009); Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1184 (11th Cir. 2009).  "The purpose of [qualified] immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'"  Lee[ v. Ferraro], 284 F.3d [1188,] 1194

14

[(11th Cir. 2002) ](citation omitted) (quoting
Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir.
2001)). Qualified immunity is a defense not only from
liability, but also from suit, so courts should
ascertain the validity of a qualified immunity defense
as early in the lawsuit as possible. See id.

"Under the well-defined qualified immunity framework, a
'public official must first prove that he was acting
within the scope of his discretionary authority when the
allegedly wrongful acts occurred.'" Terrell v. Smith,
668 F.3d 1244, 1250 (11th Cir. 2012) (quoting Lee, 284
F.3d at 1194). Once the official has done so, the burden
shifts to the plaintiff to satisfy the following two-
pronged inquiry: (1) whether the facts that a plaintiff
has shown make out a violation of a constitutional right;
and (2) whether the right at issue was clearly
established at the time of the defendant's alleged
misconduct. Pearson, 555 U.S. at 232, 129 S. Ct. 808.
. . . The Supreme Court recently has made it clear that
[courts] need not employ a rigid two-step procedure, but
rather may exercise [their] discretion to decide "which
of the two prongs of the qualified immunity analysis
should be addressed first in light of the circumstances
in the particular case at hand." Id. at 236, 129 S. Ct.
808.

Gilmore v. Hodges, 738 F.3d 266, 272-73 (11th Cir. 2013). In

determining whether the right at issue was clearly established at

the time of the incident, courts must "turn to the precedent of

the United States Supreme Court, the precedent of [the Eleventh

Circuit Court of Appeals], and to the highest court of the relevant

state in interpreting and applying the law in similar

circumstances." Poulakis v. Rogers, 341 F. App'x 523, 527 (11th

Cir. 2009).

The record evidence amply supports the determination that

Sgt. Lang and Officer Mitchell were acting within the scope of

15

their discretionary authority as prison officials at the time of the alleged conduct at issue, and Knight offers no evidence or argument to the contrary.  Accordingly, the burden now shifts to Knight to show why the Defendants are not entitled to qualified immunity.  As set forth in detail below, Knight does not meet his burden to demonstrate a constitutional violation by Defendants Lang and Mitchell; therefore, Defendants are entitled to qualified immunity.  See Hartley v. Parnell, 193 F.3d 1263, 1270-72 (11th Cir. 1999); Mallory v. Hetzel, 2016 U.S. Dist. LEXIS 115766, at *17, 2016 WL 5030469, at *6 (M.D. Ala. Aug. 26, 2016) ("[I]f a plaintiff fails to demonstrate a constitutional violation – that is, if plaintiff does not present evidence which, when viewed in the light most favorable to that plaintiff, supports an Eighth Amendment . . . claim – the officer is entitled to qualified immunity."), report and recommendation adopted, 2016 U.S. Dist. LEXIS 126915, 2016 WL 5109153 (M.D. Ala. Sept. 19, 2016).

  **1. Eighth Amendment - Failure to Protect.**

  "A prison official violates the Eighth Amendment 'when a substantial risk of serious harm, *of which the official is subjectively aware*, exists and the official does not respond reasonably to the risk.'"  Caldwell, 748 F.3d at 1099 (emphasis in original) (citation omitted).  To survive summary judgment on a failure to protect claim, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the

defendants' deliberate indifference to that risk; and (3) causation." Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam) (quotation omitted).

The first element — a substantial risk of serious harm — is measured against an objective standard. Caldwell, 748 F.3d at 1099. Under this standard, the alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam). Thus, there must be a "strong likelihood" of injury, "rather than a mere possibility," before an official's failure to act can constitute deliberate indifference. Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (quotation omitted). "Moreover, the risk must be actual, rather than potential or speculative." Estate of Owens v. GEO Grp., Inc., 660 F. App'x 763, 767 (11th Cir. 2016) (per curiam) ("So, for example, a prisoner's exposure to the potential for a fight does not, in and of itself, constitute substantial risk of harm.").

The second element — the prison official's deliberate indifference to the risk — has both a subjective and an objective component. "To satisfy the subjective component, a plaintiff must produce evidence that the defendant 'actually (subjectively) knew that an inmate faced a substantial risk of serious harm.'" Caldwell, 748 F.3d at 1099 (citation and alterations omitted).

17

"[A] prison official may have subjective knowledge only if he had both knowledge of specific facts from which an inference of risk of serious harm could be drawn, and he actually drew that inference. Estate of Owens, 660 F. App'x at 767 (internal citations omitted). To meet the objective component, a plaintiff must produce evidence that the defendant disregarded the known substantial risk by failing to respond to it in an objectively reasonable manner. Caldwell, 748 F.3d at 1099. Thus, "[i]n this context, deliberate indifference requires: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that amounts to more than mere negligence." Estate of Owens, 660 F. App'x at 767. Where more than one defendant is alleged to have been deliberately indifferent, "[e]ach individual [d]efendant must be judged separately and on the basis of what that person knows." Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008).

The third element — causation — requires a plaintiff to demonstrate a link between a defendant's act or omission and the excessive risk of harm, and a link between the risk of harm and the plaintiff's injury. LaMarca v. Turner, 995 F.2d 1526, 1538-39 (11th Cir. 1993).

In his complaint, Knight claims that Sergeant Lang and Officer Mitchell "failed to protect [him] from harm and danger" by allowing his assailant "to go to another cell and pick up a knife" and then

"let[ting] him back in B dormitory where he stabbed [Knight]."
(Doc. 1 at 4-5, 8).  With respect to Officer Mitchell, Knight
attempts to support this claim by alleging that "Officer M.
Mitchell had prior to my getting stabbed witnessed the inmate
fighting with another prisoner minutes before.  He told them not
to use no weapons but to fight one on one.  Officer Mitchell knew
there was a raucus [sic] brewing."  (Id. at 4).  As to Sergeant
Lang, Knight merely asserts that "Sgt. Lang had notice[d] the
inmate when he came out for pill call with no state shirt on and
he made him get a state shirt on."  (Id. at 8).  Knight also
contends that "they" – presumably Sergeant Lang and Officer
Mitchell – knew who stabbed him "because they let him out the cell
block to go get the knife . . . [a]nd then they watched him stab
me."  (Id.).

Taking Knight's allegations as true, there is simply no
probative evidence sufficient to show deliberate indifference to
an objectively "substantial serious risk of harm" posed by inmate
Lucas (or any inmate) to Knight prior to the stabbing on October
25, 2017.  Cf. McGill v. Duckworth, 944 F.2d 344, 349 (7th Cir.
1991) ("A prisoner normally proves actual knowledge of impending
harm by showing that he complained to prison officials about a
specific threat to his safety."), overruled in part on other
grounds by Farmer, 511 U.S. at 828.  Specifically, Knight presents
no evidence that even he was aware or fearful of a possible attack

19

at the time it occurred.  Knight does not state that he had been involved in previous altercations (or even interactions) with inmate Lucas or that he ever notified prison officials that he feared an attack by Lucas or any other inmate.  Knight's allegation that Lucas was fist fighting with another prisoner "minutes before" the stabbing, even if considered along with Knight's conclusory assertion that Defendants Lang and Mitchell "allowed" inmate Lucas to leave the dormitory to go get a knife, fails to provide probative evidence of an objectively substantial serious risk of harm posed by Lucas to Knight prior to the attack, as is necessary to establish deliberate indifference.  See Nelson v. Lett, 2018 U.S. Dist. LEXIS 216234, at *18, 2018 WL 7140235, at *7 (S.D. Ala. Dec. 21, 2018) ("Nelson's mere allegation that that Bedgood was a close custody inmate because of prior assaultive/violent behavior . . . fails to establish either of the requisite elements necessary to proceed on a claim of deliberate indifference to his safety. Specifically, there is no probative evidence before the Court of 'an objectively substantial serious risk of harm' posed by Bedgood to Nelson prior to the attack as is necessary to establish deliberate indifference."), report and recommendation adopted, 2019 U.S. Dist. LEXIS 13911, 2019 WL 362271 (S.D. Ala. Jan. 29, 2019); Johnson v. Boyd, 568 F. App'x 719, 722 (11th Cir. 2014) (finding that complaint's allegation of inmate assailant's destructive behavior in cell prior to attack did "not sufficiently

allege that [the assailant's] behavior created a 'strong likelihood' of injury to [the inmate plaintiff]").

Moreover, even if Knight had satisfied the first objective element, his claim based on Defendants' failure to protect him prior to the attack nonetheless fails because the record is utterly devoid of evidence that either Defendant possessed subjective knowledge that Lucas posed a substantial risk of serious harm to Knight. Knight alleges no prior threats, fights, arguments, or other difficulties between himself and inmate Lucas, and certainly none that either Defendant was aware of. See Averhart v. Kendrick, 2014 U.S. Dist. LEXIS 24448, 2014 WL 771126, at *3 (N.D. Ala. Feb. 25, 2014), aff'd sub nom. Averhart v. Warden, 590 F. App'x 873 (11th Cir. 2014).

Officer Mitchell's alleged knowledge that Lucas was fighting another inmate shortly prior to the stabbing, without more, fails to show that he had the requisite knowledge of a substantial risk of serious harm posed by Lucas to Knight. See Galloway, 352 F.3d 1346 (recognizing that deliberate indifference requires more than more "awareness of [an inmate's] propensity for being a problematic inmate"); Nelson, 2018 U.S. Dist. LEXIS 216234, at *19, 2018 WL 7140235, at *7 ("The mere fact that Bedgood was in close custody because of assaultive/violent behavior fails to establish that Lett and Madison possessed subjective knowledge that Bedgood posed a substantial risk of harm to Nelson, particularly in light of

mere speculation by Plaintiff that these Defendants were aware of the reason Bedgood was housed in segregation and there being no evidence that Nelson complained to these Defendants of any problems he had with Bedgood prior to the attack or that he feared Bedgood."); Murphy v. Turpin, 159 F. App'x 945, 948 (11th Cir. 2005) (per curiam). Knight's allegation that Sergeant Lang noticed Lucas leaving B-Dorm "when he came out for pill call with no state shirt on" and made Lucas put a "state shirt on" before allowing him to leave the dormitory also does nothing to establish that Sergeant Lang was subjectively conscious of a substantial risk of injury posed by Lucas to Knight.

Moreover, Knight's insinuation that Defendants permitted his assailant to leave the dormitory with the knowledge that he was retrieving a knife is purely conclusory and thus without probative value.[8]  Knight presents no specific facts that would support his apparent contention that Defendants knew Lucas was leaving the dormitory *in order to obtain a knife*.  Aside from his conclusory

---

[8] Conclusory allegations based on a plaintiff's subjective beliefs are insufficient to create a genuine dispute of material fact. See Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (holding that grant of summary judgment is appropriate where inmate produces nothing "beyond his own conclusory allegations" challenging actions of the defendants); Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose a motion for summary judgment[.]"); Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").

assertions, Knight offers no facts that remotely suggest that these Defendants knew or had any reason to know that Lucas left the dormitory to get a knife.

Accordingly, Knight's allegations against Sergeant Lang and Officer Mitchell for failure to protect him prior to the inmate attack amount to negligence at best, which is not actionable under § 1983. See Farmer, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); Hughes, 894 F.2d at 1537 ("Merely negligent failure to protect an inmate from attack does not justify liability under section 1983 . . . ."). Because Knight has not met his burden to show a constitutional violation, it is therefore recommended that summary judgment be granted in favor of Defendants Lang and Mitchell on this claim.

**2.   Eighth Amendment – Failure to Intervene.**

Construed liberally, Knight's complaint also alleges a separate Eighth Amendment claim against Defendants Lang and Mitchell for failure to intervene during the attack. Knight's only relevant allegation with respect to this claim is his assertion that "Sgt. K Lang and Officer M. Mitchell stayed outside the cellblock and watched [him] get stabbed." (See id. at 8).

"Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence." Terry v.

Bailey, 376 F. App'x 894, 896 (11th Cir. 2010) (per curiam) (citing Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998)).  In order for liability to attach, however, "the officers must have been in a position to intervene."  Id.  In other words, "[a]n officer who fails to intervene in a fight between inmates can only be held liable if he 'was physically able and had a realistic chance to intervene and act in time to protect the inmate Plaintiff.'"  Seals v. Marcus, 2013 U.S. Dist. LEXIS 25299, at *19, 2013 WL 656873, at *7 (M.D. Ga. Jan. 25, 2013), report and recommendation adopted, 2013 U.S. Dist. LEXIS 24128, 2013 WL 663579 (M.D. Ga. Feb. 22, 2013).  The inmate plaintiff bears the burden of demonstrating that the correctional officer defendant "was in a position to intervene but failed to do so."  Ledlow v. Givens, 500 F. App'x 910, 914 (11th Cir. 2012) (per curiam) (citing Hadley v. Gutierrez, 526 F.3d 1324, 1330-31 (11th Cir. 2008)).

In this case, Knight simply claims that both Defendants stayed outside B-Dorm and watched him get stabbed, but he alleges no facts regarding the duration of the attack or indicating that Defendants were in a position to intervene during the assault.  (See Doc. 1).  Although Officer Mitchell was assigned to B-Dorm as a rover on the evening in question, the record supports Officer Mitchell's declaration that he was not in the dormitory at the time of the attack.  Moreover, the Shift Log reflects that Officer Mitchell assisted with population pill call, which is listed on the log as

24

having begun at 8:42 p.m. and ended at 9:05 p.m. (Doc. 14-3 at 4). The prison reports state that it was Officer Thompkins, the cubicle officer, who observed Knight and Lucas in a verbal altercation just prior to the stabbing, and those reports further demonstrate that when Officer Thompkins called for assistance shortly thereafter, Officer Mitchell was not even one of the responding officers. (See id. at 9, 12-14). Knight himself alleges that Officer Mitchell was not inside the dormitory during the attack. (Doc. 1 at 8). With regard to Sergeant Lang, the prison reports reflect that he was one of the officers who responded to Officer Thompkins' call for assistance *after* the stabbing. (Doc. 14-3 at 13-14). Knight's general, barebones allegation that Defendants Lang and Mitchell stayed outside the housing unit and watched the attack plainly fails to meet Knight's burden to present evidence that would allow a reasonable factfinder to find that either Defendant had the ability to intervene in the assault but failed to do so. See Terry, 376 F. App'x at 896 ("Terry claims that some prison officers were outside of the cubicle area where the altercation took place and merely watched he and Dorsey fight, but Terry does not allege facts indicating that the duration of the fight or the position of the guards were such that the guards would have been in a 'position to intervene.' . . . These deficiencies are fatal to Terry's claim for failure to intervene."); Ledlow v. Givens, 500 F. App'x 910, 914 (11th Cir.

2012); <u>Seals</u>, 2013 U.S. Dist. LEXIS 25299, at *21, 2013 WL 656873, at *8.   Accordingly, the undersigned recommends that summary judgment be granted in favor of Defendants Lang and Mitchell with respect to Knight's failure to intervene claim.

### 3.   Eighth Amendment – Lack of Security.

Knight also appears to assert a claim against Defendants Lang and Mitchell based on a general "lack of security" in B-Dorm of Holman.  Knight alleges that Defendants provided a lack of security

> [b]ecause B dormitory at Holman prison is a 114 man maximum security inmates per dormitory per each dorm. With no guard posted in the cellblock neither day or night.  And by it being an open-bay cellblock composed of some of the most dangerous prisoners in the United States day and night security was a necessity.

(Doc. 1 at 8).

As noted *supra*, it is well-established that "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." <u>Farmer</u>, 511 U.S. at 868.  To survive summary judgment on his claim of inadequate security, Knight "was required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." <u>Hale v. Tallapoosa Cnty.</u>, 50 F.3d 1579, 1582 (11th Cir. 1995).  Moreover, to prevail against Defendants Lang and Mitchell in their individual capacities, Knight "was required to

26

show that they were personally involved in acts or omissions that resulted in the constitutional deprivation." Id.

With respect to the objective element of his Eighth Amendment claim, Knight must show that the conditions under which he was incarcerated presented "a substantial risk of serious harm" to him. Farmer, 511 U.S. at 834. "The challenged condition must be 'extreme.'" Chandler v. Crosby, 379 F.3d 1278, 1279 (11th Cir. 2004) (citation omitted). This objective risk may be established by alleging facts which show the existence of "an excessive risk of inmate-on-inmate violence" at a prison, an atmosphere where "violence and terror reign" or that there is a "constant threat of violence" and assault by other inmates. Purcell, 400 F.3d at 1320. However, "occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment[.]" Id.

Knight has failed to present any evidence that the alleged lack of security inside the dormitory presented a severe or extreme condition that posed an unreasonable risk of serious harm to his safety. Indeed, the only evidence of inmate-on-inmate violence presented by Knight are his sworn allegations regarding his own stabbing on October 25, 2017 and his assailant's fist fights with another inmate shortly before the stabbing. This is insufficient to demonstrate an excessive risk of inmate-on-inmate violence. See id. at 1322-23 (finding evidence that inmate fighting occurred at jail and that a few serious fights occurred to be "less severe

than what would be sufficient to rise to the level of demonstrating objectively a substantial risk of serious harm to inmates"). In addition, the prison records from the night of the incident demonstrate that the dormitory was being monitored by a cubicle officer who, shortly before the stabbing, noticed a disturbance in the housing unit, turned on the dormitory's lights, and reported the disturbance. (Doc. 14-3 at 4, 9, 12-14). After Knight was stabbed, the cubicle officer promptly reported the attack, and multiple officers promptly responded to the cubicle officer's call for assistance. (Id.). Knight's subjective beliefs and conclusory allegations regarding the adequacy of security in the housing unit, absent any additional supporting facts beyond those contained in his complaint, and in light of the evidence presented by Defendants, do not create a genuine issue of material fact as to the seriousness of the risk to inmates. See Broadnax v. Wynne, 2015 U.S. Dist. LEXIS 19542, 2015 WL 729525, at *18 (M.D. Ala. Feb. 19, 2015). Accordingly, Knight has not satisfied the objective element of his Eighth Amendment claim because he has failed to establish that the alleged lack of security in B-Dorm presented "a substantial risk of serious harm." See Farmer, 511 U.S. at 834. Nor has he shown that Defendants Lang and Mitchell were aware of such a risk and chose to disregard it. Consequently, Knight's has failed to present evidence supporting an Eighth

Amendment violation for general "lack of security" inside the housing unit.

### IV. <u>CONCLUSION</u>

Based on the foregoing, the Court concludes that Defendants Lang and Mitchell are entitled to summary judgment. Accordingly, it is recommended that Defendants' motion for summary judgment be **GRANTED**, and that Plaintiff Knight's action be **DISMISSED with prejudice.**

<u>**NOTICE OF RIGHT TO FILE OBJECTIONS**</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper

29

objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **7th** day of **February, 2020.**

        **/s/ SONJA F. BIVINS**
        **UNITED STATES MAGISTRATE JUDGE**